UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

**UNITED STATES OF AMERICA**          **CASE NO.  3:24-CR-00017-01**

**VERSUS**                            **JUDGE TERRY A. DOUGHTY**

**CHARLES LOGWOOD (01)**              **MAG. JUDGE KAYLA D. MCCLUSKY**

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion to Suppress [doc. #28] filed by Defendant Charles Logwood.  The motion is opposed.  [doc. #29]. For reasons stated below, it is RECOMMENDED that the motion be GRANTED IN PART and DENIED IN PART.

## Background

On August 15, 2023, the Drug Enforcement Administration ("DEA") and Metro Narcotics agents were alerted by a confidential source that Charles Logwood ("Logwood") would be driving from Texas with a large quantity of narcotics to distribute to the source.  (Opp. to M/Suppress [doc. #29, p. 1]).  The following day, August 16, 2023, agents notified local law enforcement that Logwood would be driving a black Ford Edge and heading to Lowe's in Monroe, Louisiana.  *Id.* At approximately 4:00 p.m. on that day, Ouachita Parish Sheriff Deputy Andrew Nugent ("Nugent") was on Frontage Road in Monroe, Louisiana, when he allegedly observed a black Ford Edge turn into the Lowe's parking lot without using a turn signal.  *Id.* at p. 2; (M/Suppress [doc. #28, p. 1]).  As a result, Nugent initiated a traffic stop and made contact with the sole occupant and driver, Logwood.  (Opp. to M/Suppress [doc. #29, p. 2]); (M/Suppress [doc. #28, p. 1]).

Upon approaching the vehicle, Nugent detected the odor of marijuana coming from inside the vehicle. (Opp. to M/Suppress [doc. #29, p. 2]). Logwood was asked to exit the vehicle and was informed that the odor of marijuana had been detected. *Id.* In response, Logwood admitted to having marijuana inside the vehicle. *Id.* When asked if there were any weapons in the car, Logwood confirmed there was a firearm under the driver's seat but that he was not carrying it on his person. *Id.* Nugent conducted a pat-down of Logwood, discovering $1,120.00 in U.S. currency. *Id.* After advising Logwood of his Miranda rights, Nugent asked how much marijuana was in the car, to which Logwood replied, "a blunt." *Id.* Logwood also informed Nugent that the firearm was under the driver's seat. *Id.* Nugent then asked for consent to search Logwood's vehicle, and Logwood consented, saying "you can search the vehicle." *Id.*

Additional deputies arrived at the scene, and a search of the vehicle was conducted. *Id.* The search yielded: (1) a Taurus pistol; (2) a backpack containing 1,484 grams of marijuana; and (3) two packages wrapped together in black plastic contained in a cardboard box. *Id.* at pp. 2-3. When asked if the packages contained methamphetamine, Logwood confirmed they did. *Id.* at p. 3.

Logwood was subsequently transported to the Metro Narcotics office for questioning. *Id.* Before questioning began, he was *Mirandized* by DEA Agent Andrew Laiche ("Laiche"). *Id.* The interview was conducted by Laiche and Officer Seth Cox. (Post-Hearing Memo in Support of M/Suppress [doc. #42, p. 3]). Laiche read Logwood his *Miranda* rights, and immediately following, Logwood stated that he would like a lawyer. *Id.* Following that statement, Laiche asked Logwood, "So you want to talk to us, or you want a lawyer?" (Exhibit 3). Logwood then responded by stating "I would like a lawyer, but I mean . . ." (Exhibit 3). Laiche then stated "If you ask for a lawyer, I can't help you. It's up to you. For what is happening at this moment in time,

2

this is your only chance to help yourself out . . ."  (Exhibit 3).  Laiche then slid the *Miranda* form towards Logwood telling him that the form was acknowledging he was read his rights and that he understood them.  (Exhibit 3).  Logwood proceeded to read over the form and sign it.  (Exhibit 3).

As a result of the investigation, a federal grand jury returned a three-count indictment against Logwood on February 14, 2024, charging him with (1) possession with the intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); (2) possession with the intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D); and (3) possession of a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A). Logwood was arraigned on March 6, 2024, whereupon he entered a plea of not guilty to each count.

On May 24, 2024, Logwood filed the instant Motion to Suppress all evidence obtained from the search of the Ford Edge he was driving in Monroe, Louisiana.  [doc. #28].  Logwood contends that the physical evidence does not support that there were grounds for a traffic stop. (M/Suppress [doc. #28, p. 2]).  He further asserts that video evidence from law enforcement and the scene fails to show that he did not use his turn signal, undermining the basis for reasonable suspicion.  *Id.*  Because the stop lacked reasonable suspicion, and the subsequent search and seizure of the vehicle was conducted without a warrant, Logwood argues that all evidence obtained as a result should be suppressed.  *Id.* at pp. 3-4.  Additionally, Logwood seeks to suppress any incriminating statements made during his interrogation at the Metro Narcotics office, claiming he did not validly waive his *Miranda* rights and that his confession was involuntary.  *Id.* at p. 2-3.

On June 7, 2024, the Government filed its response to the motion, arguing that the traffic stop was justified as Nugent had reasonable suspicion that Logwood had committed a traffic violation by failing to use his blinker.  (Opp. to M/Suppress [doc. #29, pp. 4-6]).  Furthermore, the

search of the vehicle was lawful, as Nugent had probable cause after smelling marijuana and receiving admissions from Logwood regarding the presence of both marijuana and a firearm in the vehicle. *Id.* at pp. 6-7.  The Government also pointed out that Logwood had given explicit consent for the vehicle search. *Id.* at p. 7.  Regarding Logwood's statements at the Metro Narcotics office, the Government contends that Logwood's statement of wanting a lawyer was ambiguous and did not require the agents to halt their questioning. *Id.* at p. 13.  Since Logwood ultimately waived his *Miranda* rights, the Government maintains that no constitutional violation occurred. *Id.*

A hearing on the Motion to Suppress was held on August 14, 2024.  Logwood filed his post-hearing memorandum on September 10, 2024, reiterating his arguments that there was no reasonable suspicion to justify the traffic stop.  [doc. #42, p. 4.].  Logwood argued that Nugent's claim of observing a traffic violation was implausible due to the distance between the vehicles and the speed at which Nugent was driving. *Id.*  Further, Nugent only had a "mere hunch," as he just thought Logwood had narcotics. *Id.* He further challenged the adequacy of the information law enforcement relied on, noting that a conversation between a DEA handler and the confidential source indicated that Logwood did not have drugs at that time, and he had been under surveillance since then. *Id.*  Without corroboration, it remains unclear how the source could have obtained new information implicating Logwood. *Id.*  As a result, Logwood argued that the evidence seized during the search of the vehicle should be suppressed as the lack of reasonable suspicion for the traffic stop rendered the stop illegal, making the evidence "fruit of the poisonous tree." *Id.* at p. 6.

As to the statements during his interrogation, Logwood asserts that his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel were violated. *Id.* at p. 5.  Logwood asserts that agents violated his rights by (1) not suspending questioning once Logwood asked for an attorney, and (2) misrepresenting the *Miranda* waiver form as a form of

acknowledgment that he had been read his rights. *Id.* Logwood's confession was involuntary, and thus, his confession must be suppressed. *Id.* at p. 6.

The Government's response to Logwood's post-hearing brief, filed on September 23, 2024, reaffirmed its argument that Nugent had reasonable suspicion for the traffic stop based on his observations and that aerial footage corroborated the absence of a turn signal. [doc. #43, p. 2]. The Government also argued that officers and agents had ample reason to believe Logwood had narcotics in the vehicle based on phone calls between him and the confidential source. *Id.* Regarding the search of the vehicle, the Government argues that since the traffic stop was justified, and Nugent developed probable cause due to the smell of marijuana, the search was constitutional. *Id.* at p. 4. As to the statements made by Logwood during his interview, the Government contends that agents did suspend questioning as they explained to Logwood they could ask no further questions if Logwood wanted a lawyer. *Id.* at p. 3. Finally, the Government maintained that Logwood's waiver of his *Miranda* rights was voluntary and that he clearly understood the implications of signing the form. *Id.*

Logwood did not file a reply. Accordingly, the matter is ripe.

## Relevant Testimony and Documentary Evidence

At the hearing, two witnesses testified: Deputy Andrew Nugent and Agent Andrew Laiche. Both were called by the Government. Additionally, the Government introduced three exhibits, all of which were accepted into evidence. The first exhibit was aerial footage from August 16, 2023, showing Frontage Road at the time of the traffic stop. (Tr. 15). The second exhibit was body camera footage from the same traffic stop on August 16, 2023. (Tr. 7). Exhibit three was video

footage of the interview conducted of Logwood by Agent Laiche and Task Force Officer Cox at the Metro Narcotics building.  (Tr. 26-28).

The Court summarizes the relevant testimony and evidence as follows:

Deputy Sergeant Andrew Nugent ("Nugent"), a sergeant with the Ouachita Parish Sheriff's Office, has been employed with the Sheriff's Office for nearly eighteen years.  (Hearing Transcript [doc. #41, p. 3]) (hereinafter abbreviated as "Tr." followed by the page number).  Nugent currently is a supervisor for the SCAT (Street Crimes) team.  (Tr. 3).

## I.    The Traffic Stop

Nugent testified that he was informed by fellow law enforcement officers that Logwood may be transporting a large quantity of narcotics into Ouachita Parish.  (Tr. 4).  This information was provided during a meeting at the Ouachita Parish Sheriff's Office.  (Tr. 17).  On August 16, 2023, Nugent was stationed near the Accent building in Monroe, Louisiana, while other agents surveilled the area for Logwood.  (Tr. 4-5).  Nugent had been advised to be on the lookout for a black Ford Edge.  (Tr. 5).  After being notified of Logwood's location, Nugent spotted the black Ford Edge on Frontage Road.  (Tr. 5, 18).  At that time, Nugent was approximately a mile behind the vehicle and observed that the driver failed to use a turn signal when turning into the Lowe's parking lot.  (Tr. 5, 19).  Nugent activated his lights, accelerated to 100 miles per hour to catch up to Logwood, ended up thirteen seconds behind Logwood on Frontage Road, and pulled Logwood over.  (Tr. 6, 19-20).

Nugent testified that his body camera recorded the entirety of the traffic stop.  (Tr. 7).  The footage showed Nugent approaching the vehicle and requesting Logwood to identify himself.  (Tr. 7-8).  Logwood complied by providing his driver's license.  (Tr. 8).  As Nugent approached the

vehicle, he detected the order of marijuana. (Tr. 8). Nugent asked Logwood to step out of the vehicle, and after advising him of his *Miranda* rights, questioned him about the odor. (Tr. 8). Logwood disclosed that there was a firearm inside the vehicle and also admitted there was marijuana in the form of a blunt. (Tr. 9).

Upon frisking Logwood, Nugent discovered a large sum of cash in his pocket. (Tr. 9). Nugent then requested and received Logwood's consent to search the vehicle. (Tr. 11). Deputy Jacob Robinson ("Robinson") and Nugent then proceeded to search the vehicle. (Tr. 11). Robinson and Nugent found three pounds of marijuana, some crushed pills, and a box in the back of the vehicle wrapped tightly in plastic, consistent with narcotics packaging. (Tr. 11-12). When asked if the packages contained methamphetamine, Logwood confirmed that they did. (Tr. 13). A .45 caliber firearm was also recovered from the vehicle. (Tr. 14).

The Government next called Agent Andrew Laiche ("Laiche") to the stand. (Tr. 22). He has been with the Drug Enforcement Administration ("DEA") for three and a half years and is currently a special agent. (Tr. 23). One of the long-term drug investigations Laiche worked on involved Logwood. (Tr. 23).

The investigation started from a confidential source that informed agents Logwood would be traveling to Monroe to sell narcotics. (Tr. 24). Although the confidential source has been used in prior cases, none had yet resulted in a conviction. (Tr. 36-37). The confidential source currently faces seven felony charges in Ouachita Parish. (Tr. 37). As part of their cooperation, the confidential source would be considered a "cooperating defendant." (Tr. 37).

The agents instructed the confidential source to arrange a drug transaction with Logwood. (Tr. 25). Multiple phone calls between the two were recorded, though no explicit terms such as

"drugs," "methamphetamine," "meth," "marijuana," and "weed" were mentioned. (Tr. 25, 31-32). Neither the confidential source nor Logwood mentioned any amount of money on those phone calls. (Tr. 32-33). However, one phone call, which detailed the terms of the transaction, was not recorded. (Tr. 33-34). Laiche was unable to confirm whether the confidential source had threatened Logwood during that call. (Tr. 34).

The operation commenced with a face-to-face meeting between Logwood and the confidential source, which was surveilled by agents. (Tr. 25). After the meeting, law enforcement planned to intercept Logwood and seize the narcotics. (Tr. 25). Local law enforcement officers, including Nugent, were responsible for conducting the traffic stop, as is standard procedure in such operations. (Tr. 25).

Laiche confirmed that aerial surveillance had been conducted by helicopter. (Tr. 26). After agents received confirmation that the methamphetamine was in the vehicle, Laiche proceeded back to the DEA office to interview Logwood. (Tr. 26).

## II.    Interview of Logwood

After Logwood was placed in an interview room at the Metro Narcotics Unit building, Laiche entered to conduct the interview, accompanied by Agent Seth Cox ("Cox"). (Tr. 26-27, 38). The interview room was equipped with a recording device that captured both audio and visual. (Tr. 26-27). The Government introduced this recording as Exhibit 3, which was played during the hearing. (Tr. 28-29). Upon entering the room, Laiche informed Logwood of his *Miranda* rights. (Tr. 27). After being informed of his rights, Logwood stated that he would like a lawyer. (Tr. 27). The footage revealed that, after Logwood requested an attorney, Laiche asked Logwood if he would like to talk to the agents or if he wanted a lawyer. (Tr. 29). Logwood then responded by stating "I would like a lawyer, but I mean . . ." (Tr. 29). Laiche then stated, "If you ask for a lawyer,

I can't help you. It's up to you. For what is happening at this moment in time, this is your only chance to help yourself out . . ." (Exhibit 3). Laiche then slid the *Miranda* waiver form towards Logwood, explaining that it served as an acknowledgment that Logwood had been read his rights and understood them. (Exhibit 3).

Logwood reviewed and subsequently signed the form. (Exhibit 3). Following the signature, Laiche asked Logwood if he had anything he wanted to share. (Tr. 30). Logwood then began to provide a full statement to the agents. (Tr. 30). At no point during the remainder of the interview did Logwood again request an attorney. (Tr. 30). Once the interview concluded, Logwood was transported to Ouachita Correctional Center for booking. (Tr. 31).

## Law and Discussion

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." U.S. CONST. amend. IV.[1] "The question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution." *United States v. Cordero*, 465 F.3d 626, 630 (5th Cir. 2006) (citation omitted).

"The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (citations omitted). Evidence obtained in violation of the Fourth Amendment is generally excluded and "cannot be used in a

---

[1] The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207 (1979) (citation omitted).

criminal proceeding against the victim of the illegal search or seizure." *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The purpose of this exclusionary rule is to deter unlawful police conduct. *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006). By refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused." Id. (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)).

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Miranda v. Arizona*, the Supreme Court held that to safeguard this privilege against self-incrimination, law enforcement officers must advise individuals of their rights prior to a custodial interrogation. 384 U.S. 436, 478-79 (1966). A violation of these protections can result in the exclusion of statements obtained during the interrogation. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004). The purpose of the Miranda rule is to protect against the inherent compulsion of custodial questioning. *Dickerson v. United States*, 530 U.S. 428, 435 (2000).

The Sixth Amendment guarantees the right to the assistance of counsel once formal judicial proceedings have been initiated. U.S. CONST. amend. VI. Any statements deliberately elicited from a defendant after this point, in the absence of counsel, may be suppressed under the Sixth Amendment. *Massiah v. United States*, 377 U.S. 201, 206 (1964).

I.    **Traffic Stop**

Traffic stops are seizures within the meaning of the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 255 (2007). As traffic stops are considered investigative detentions rather than formal arrests, they are analyzed under the *Terry* framework. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). Under that test, a traffic stop is permissible if (1) the officer's decision to initiate a traffic stop was justified at its inception and (2) the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop in the first place. *Terry v. Ohio*, 392 U.S. 1, 20 (1968).

To justify the decision to initiate a traffic stop, "'an officer must have an objectively reasonable suspicion'" that some sort of illegal activity, such as a traffic violation, has occurred or is about to occur. *United States v. Broadway*, 850 F. App'x 271, 272 (5th Cir. 2021) (per curiam) (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)). An officer has reasonable suspicion if he can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop. *Terry*, 392 U.S. at 21. Courts look at the totality of the circumstances to determine whether an officer had a "particularized and objective basis" for suspecting illegal conduct. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "A tip from an informant, anonymous or otherwise, may provide reasonable suspicion." *Broadway*, 850 F. App'x at 272.[2] Seizures "justified only by a police-observed traffic violation" may not exceed the time reasonably

---

[2] In assessing an informant's tip, courts consider (1) the credibility and reliability of the information; (2) the specificity of the information; (3) the ability of the officers in the field to verify the information; and (4) whether the tip deals with active or recent conduct. *United States v. Hernandez*, 477 F.3d 210, 214 (5th Cir. 2007).

required to "handle the matter for which the stop was made." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015).

Here, Nugent was justified in initiating the traffic stop. Nugent testified that he observed Logwood fail to use his turn signal before turning into the Lowe's parking lot. (Tr. 5). Notably, during the interaction captured on body camera footage, when Nugent asked Logwood if he had forgotten to signal, Logwood did not deny the omission. (Exhibit 2). Instead, Logwood offered the excuse that he intended to go into the store. (Exhibit 2). Under Louisiana law, "[w]henever a person intends to make a right or left turn which will take his vehicle from the highway it is traveling, he shall give a signal of such intention . . ." LA. REV. STAT. § 32:104(B). The failure to use a turn signal constitutes a traffic violation, which provides law enforcement with reasonable suspicion to initiate a traffic stop.

Logwood argues that, because Nugent had to accelerate to 100 miles per hour, pass two vehicles, and arrived in the parking lot thirteen seconds after Logwood, it would have been improbable for Nugent to see whether the turn signal was used. (Post-Hearing Memo in Support of M/Suppress [doc. #42, p. 4]). However, Nugent, a law enforcement officer with over eighteen years of experience, testified under oath that he did not observe a turn signal. (Tr. 5). Furthermore, there is no evidence or testimony that Logwood did, in fact, use his signal. Rather, Logwood merely contends that it is "ludicrous" to suggest Nugent could determine whether the turn signal was on under the circumstances. This argument, however, lacks merit. Based on the evidence, there was reasonable suspicion to justify the traffic stop.

Logwood also asserts that law enforcement lacked sufficient information to suspect that he possessed drugs, and, thus, the stop was unjustified. (Post-Hearing Memo in Support of M/Suppress [doc. #42, p. 4]). This Court need not get delve into this argument as a traffic violation

alone provides reasonable suspicion to conduct a traffic stop, irrespective of whether law enforcement had additional information suggesting the presence of drugs.

Accordingly, IT IS RECOMMENDED that the Motion to Suppress be DENIED to the extent it seeks to exclude evidence on the basis of an unlawful traffic stop.

## II.    Search and Seizure of Vehicle

"Once the purpose of a valid traffic stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006).  If the officer develops reasonable suspicion of additional criminal conduct during his investigation of the circumstances that initially justified the stop, he may further detain the vehicle's occupants for a reasonable time while "appropriately attempting to dispel this reasonable suspicion." *United States v. Smith*, 952 F.3d 642, 647 (5th Cir. 2020) (quoting *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010)).

The law in the Fifth Circuit is clear: if officers smell marijuana coming from inside the vehicle, they have probable cause to search the vehicle.  *See United States v. Lork*, 132 F. App'x 34, 35-36 (5th Cir. 2005) (per curiam) (holding that, after conducting a lawful traffic stop for speeding, the officer detected an odor of marijuana emanating from the defendant's vehicle, thereby creating probable cause to search vehicle); *United States v. Reed*, 882 F.2d 147, 149 (5th Cir. 1989) (detection of marijuana odor emanating from vehicle provides law enforcement with probable cause to search vehicle); *United States v. Henke*, 775 F.2d 641, 645 (5th Cir. 1985) ("Once the officer smelled the marijuana, he had probable cause to search the vehicle."); *United States v. Ibarra-Sanchez*, 199 F.3d 753, 760 (5th Cir. 1999) ("Regardless of precisely how near or far from

the van the officers were when they detected the odor, once they did so they possessed probable cause to search").

Nugent testified that, upon approaching Logwood's vehicle, he detected the odor of marijuana emanating from within. (Tr. 8). As a result, Nugent asked Logwood if there was marijuana in the vehicle, to which Logwood responded that there was a blunt. (Tr. 8-9). The detection of the odor of marijuana alone provided Nugent with probable cause to search the vehicle. In addition, Logwood's admission that marijuana was present further solidified the probable cause necessary for law enforcement to conduct the search.

Logwood contends that the evidence seized during the search must be suppressed as "fruit of the poisonous tree." (Post-Hearing Memo in Support of M/Suppress [doc. #42, p. 6]). He argues that the evidence resulted from the exploitation of the "primary illegality" of the initial traffic stop. *Id.* However, as discussed above, the traffic stop was not unlawful. Nugent had reasonable suspicion to initiate the stop on Logwood's failure to use his turn signal, a traffic violation under Louisiana law. Since the traffic stop was lawful, and Nugent subsequently developed probable cause to search the vehicle upon detecting the odor of marijuana, the search and seizure of evidence was valid and did not violate the Fourth Amendment.

Moreover, Logwood provided consent for Nugent to search the vehicle. (Tr. 11). "A warrantless search is presumptively unreasonable, subject to certain exceptions, such as voluntary consent." *United States v. Soriano*, 976 F.3d 450, 455 (5th Cir. 2020) (citation omitted). To evaluate the voluntariness of consent, we consider the following six factors: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief

that no incriminating evidence will be found." *Id.* (quoting *United States v. Santiago*, 410 F.3d 193, 199 (5th Cir. 2005)).

*Voluntariness of the Defendant's Custodial Status* – "Voluntariness of custodial status turns on whether a reasonable person in the defendant's position would feel free to terminate the encounter." *Soriano*, 976 F.3d at 455 (citing *United States v. Cavitt*, 550 F.3d 430, 439 (5th Cir. 2008)). Here, Logwood was neither under arrest nor in handcuffs when he gave consent to search the vehicle. (Exhibit 2). Further, at the time consent was given, Logwood's hands were no longer on the hood of the police car. (Exhibit 2). While Nugent did not explicitly inform Logwood that he was free to go, this fact is not dispositive. *See Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996). However, given that Logwood had been asked to step out of the vehicle, frisked, read his *Miranda* rights, and was waiting for another deputy to arrive, a reasonable person might not have felt free to leave. Thus, this factor weighs in favor of a finding that Logwood's consent was involuntary.

*Presence of Coercive Police Procedures* – Coercive conduct includes threats, promises, trickery, or deceit intended to pressure a suspect into consenting to a search. *United States v. Alkheqani*, 78 F.4th 707, 720 (5th Cir. 2023). In this instance, there is no evidence of coercive conduct. Nugent and Logwood engaged in a conversation about their shared military experiences, which occurred after Logwood had been frisked and before consent was sought. (Exhibit 2). There were no threats or deceptive tactics. Moreover, Nugent was the only officer present at the scene when he asked for consent, a fact that further weighs against finding coercion. Thus, this factor weighs in favor of a finding that Logwood's consent was voluntary.

*Extent and Level of the Defendant's Cooperation with the Police* – Logwood was fully cooperative with law enforcement. He complied with Nugent's instructions to exit the vehicle, placed his hands on the hood, and responded to all questions posed by Nugent. (Exhibit 2).

Additionally, Logwood informed Nugent about the contents of his vehicle. (Tr. 9). Nugent characterized Logwood as "a nice guy" who was polite and cooperative throughout the interaction. (Tr. 15). Cooperation by the defendant is a factor favoring a finding of voluntariness. *Soriano*, 976 F.3d at 457. Thus, this factor weighs in favor of a finding that Logwood's consent was voluntary.

*Defendant's Awareness of His Right to Refuse to Consent* – Nugent did not inform Logwood that he had the right to refuse consent, which weighs against voluntariness. *See Alkheqani*, 78 F.4th at 721 (quoting *Soriano*, 976 F.3d at 457). Although Nugent read Logwood his *Miranda* rights, which Logwood acknowledged he understood, *Miranda* warnings do not inform suspects of their right to refuse consent for searches. (Exhibit 2). Given the absence of an explicit advisement of this right, it is unlikely that Logwood was aware he could refuse consent. Thus, this factor weighs in favor of a finding that Logwood's consent was involuntary.

*Defendant's Education and Intelligence* – Although no specific evidence was presented regarding Logwood's education and intelligence, his clear and cooperative responses during the traffic stop suggest he was of at least average intelligence. (*See* Exhibit 2). Logwood, 33 years old at the time, interacted coherently with law enforcement. Thus, this factor weighs in favor of a finding that Logwood's consent was voluntary.

*Defendant's Belief that No Incriminating Evidence Will Be Found* – "An awareness or belief that no incriminating evidence will be found weighs in favor of a finding of voluntariness." *Soriano*, 976 F.3d at 458. Here, Logwood had told Nugent that there was a blunt in the vehicle and a firearm underneath one of the seats. (Exhibit 2). The other contraband was concealed in less obvious places, such as a backpack and a cardboard box. (Opp. to M/Suppress [doc. #29, p.

16

10]). It is reasonable to infer that Logwood believed no further incriminating evidence would be discovered. Thus, this factor weighs in favor of a finding that Logwood's consent was voluntary.

This Court finds, after looking at the totality of the circumstances, that Logwood's consent to search the vehicle was voluntary. Therefore, Nugent had probable cause to search the vehicle based on Logwood's consent as well as based on the detection of the odor of marijuana and Logwood's admission that marijuana was inside.

Accordingly, IT IS RECOMMENDED that the Motion to Suppress be DENIED to the extent it seeks to exclude evidence obtained from the search and seizure of the vehicle and the evidence inside.

### III.    Interview of Logwood

The Fifth Amendment to the United States Constitution guarantees that no individual "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Miranda v. Arizona*, the Supreme Court established that the prosecution may not use statements stemming from the custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards to secure the privilege against self-incrimination. 384 U.S. 436, 444 (1966). "*Miranda* warnings must be administered prior to 'custodial interrogation.'" *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (citing *Miranda*, 384 U.S. at 479). "A suspect is . . . 'in custody' for Miranda purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Palmer*, 111 F.4th 588, 594 (5th Cir. 2024) (quoting *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015)). Whether a suspect is "in custody" is an objective inquiry that depends on the totality of the circumstances. *Id.* (citing *United States v. Nelson*, 990 F.3d 947, 955 (5th Cir. 2021)).

The Sixth Amendment of the United States Constitution confers the right to all accused in a criminal prosecution to "have the assistance of counsel for his defense." U.S. CONST. amend. VI. The assertion of the right to counsel is a significant event and once exercised by the accused, "the interrogation must cease until an attorney is present." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981) (quoting *Miranda*, 384 U.S. at 474). "[A] voluntary Miranda waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel." *Maryland v. Shatzer*, 559 U.S. 98, 105 (2010). In order to invoke the right to counsel during a custodial interrogation, the accused must make a statement that can "reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991). The invocation of the right to counsel cannot be "ambiguous or equivocal." *Davis v. United States*, 512 U.S. 452, 459 (1994). "[W]hen a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Id.* at 461.

A suspect may knowingly and intelligently waive his *Miranda* rights and agree to answer questions once adequate warnings have been given. *United States v. Cardenas*, 410 F.3d 287, 292 (5th Cir. 2005). A defendant's waiver of his *Miranda* rights is effective only if voluntary. *Id.* The inquiry whether a valid waiver has occurred is two dimensional: (1) the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception; and (2) waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.* at 293 (citing *United States v. Andrews*, 22 F.3d 1328, 1337 (5th Cir. 1994)). Although *Miranda* imposes on the police a rule that is both formalistic and practical when it prevents them

18

from interrogating suspects without first providing them with a *Miranda* warning, it does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights. *Berghuis v. Thompkins*, 560 U.S. 370, 385 (2010).

It is undisputed that Logwood was in custody and had been read his *Miranda* rights by Laiche. Logwood had been arrested and transported to the Metro Narcotics office for questioning. (Tr. 31). Because the interview followed an arrest, Logwood was clearly in custody for *Miranda* purposes. Furthermore, Logwood was advised of his *Miranda* rights both during the initial stop by Nugent and again by Laiche prior to questioning at the Metro Narcotics office. (Exhibit 2, 3).

The core issues in dispute are: (1) whether Logwood invoked his right to counsel; and (2) whether Logwood knowingly and intelligently waived his *Miranda* rights.

*(a) Invocation of Right to Counsel*

After Laiche read Logwood's rights to him, Logwood stated, "I would like a lawyer." (Exhibit 3). An invocation of the right to counsel cannot be ambiguous or equivocal. *Davis*, 512 U.S. at 459 (1994). There is no ambiguity in Logwood's statement. The Court finds this to be a direct and unmistakable assertion of the right to counsel.

The Government contends that Logwood's subsequent statement "I would like a lawyer, but I mean," accompanied by a shrug, was ambiguous and equivocal. (Opp. to M/Suppress [doc. #29, p. 12]). However, this later statement occurred after Logwood had already invoked his right to counsel. According to *Smith v. Illinois*, "an accused's postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel." 469 U.S. 91 (1984). The original statement— "I would like a lawyer" —was clear and unequivocal, and, thus, the agents were required to cease questioning immediately. The Government's attempt

19

to introduce ambiguity by focusing on Logwood's later remark cannot undermine the clear invocation he made earlier.

Accordingly, the Court finds that Logwood did clearly and unambiguously invoke his right to counsel.

  *(b) Waiver of Miranda*

When an accused clearly and unambiguously invokes their right to counsel, all questioning must immediately cease. *Edwards*, 451 U.S. at 484. As the Supreme Court in *Smith* stated, "where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease." 469 U.S. at 98. The Court further held that any subsequent statements by the accused are relevant only to determine whether they knowingly and intelligently waived the right they previously invoked. *Id.* Once the right to counsel has been invoked, courts may only admit responses to further questioning if the accused (1) initiated further discussions with the police, and (2) knowingly and intelligently waived the right he had invoked. *Id.* at 95.

In *Smith*, the Court found the accused's statement, "Uh, yeah. I'd like to do that," was a clear and unambiguous invocation of his right to counsel. *Id.* at 93. Despite this, the detectives failed to immediately stop the interrogation. *Id.* Instead, they continued reading his Miranda rights and asked, "Do you wish to talk to me at this time without a lawyer being present?" *Id.* The Court held that the detectives' failure to cease questioning was a violation, and any later statements made by the accused could not undermine the original unambiguous request for counsel. *Id.* at 93.

Here, Logwood similarly made a clear and unambiguous request for counsel when he stated, "I would like a lawyer." (Exhibit 3). Under *Smith*, this unequivocal request required the

agents to immediately stop the interview.  *See Smith*, 469 U.S. at 95.  However, instead of ceasing the interrogation, the agents continued to ask Logwood if he wanted to speak to them or if he wanted an attorney.  (Exhibit 3). This additional questioning was improper under *Smith* because it came after Logwood had clearly invoked his right to counsel.

Moreover, Logwood never initiated any further conversation with the agents after invoking his right to counsel.  (Exhibit 3).  When determining if a valid waiver of a person's *Miranda* rights has occurred, the Court must determine if the accused initiated further discussion with law enforcement.  Here, it was agents who continued the conversation, not Logwood.  (Exhibit 3).  His responses to the agents' questions were in reaction to their continued interview, not voluntary reinitiation of dialogue.  As such, any further questioning after his invocation was improper, and Logwood could not have knowingly and intelligently waived his right to counsel under these circumstances.

Additionally, while Logwood signed a Miranda waiver form after invoking his right to counsel, this does not constitute a valid waiver of his rights.  The Supreme Court in *Maryland* stated:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights . . . [He] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

559 U.S. at 104 (citing Edwards, 451 U.S. at 484-85).

Logwood did not initiate further conversation with the agents; he simply responded to further police-initiated questions and actions.  (Exhibit 3).  Under *Maryland*, a waiver cannot be

21

established merely by Logwood's compliance with police-initiated questions, even if he signed a *Miranda* waiver form.  559 U.S. at 104.  Therefore, any statements or actions by Logwood after invoking his right to counsel must be suppressed, as he could not have knowingly and voluntarily waived his *Miranda* rights when the interrogation did not cease as required by law.

Accordingly, IT IS RECOMMENDED that the Motion to Suppress be GRANTED to the extent it seeks to suppress statements made by Logwood after he invoked his right to counsel.

### Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the Motion to Suppress [doc. #28] filed by Defendant Logwood be GRANTED IN PART and DENIED IN PART.  To the extent that Logwood moves to suppress statements made at the Metro Narcotics office after he invoked his right to counsel, IT IS RECOMMENDED that the motion be GRANTED, and these statements be suppressed.  IT IS OTHERWISE RECOMMENDED that the motion be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL**

**BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 29th day of October, 2024.

KAYLA DYE MCCLUSKY<br>
UNITED STATES MAGISTRATE JUDGE